# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )      Case No.  '22 MJ1015
)
Federal Bureau of Investigation, Evidence Vault, )
10385 Vista Sorrento Parkway, San Diego, CA 92121 )
(Target Devices Related to GirlsDoPorn) )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Secs. 1591, 1594, 1956 | sex trafficking, conspiracy to sex traffic, money laundering |

The application is based on these facts:
See Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____*)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Lana Sabata, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephone___ *(specify reliable electronic means)*.

*Judge's signature*

Date: 03/17/2022

City and state: San Diego, CA     Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Lana K. Sabata, being duly sworn, do hereby state that the following is true to my knowledge and belief:

**I**

**TRAINING AND EXPERIENCE**

1. I am a special agent with the Federal Bureau of Investigation (FBI) and have been so employed since May 2008. In October 2008, the FBI assigned me to the Violent Crime and Major Offender Program in Northwest Indiana. Duties under this program focus on federal violent crime investigations including kidnapping, extortion, interstate transportation of stolen property, bank robberies, criminal gang activity and drug trafficking. Additionally, I was assigned as the Crimes Against Children (CAC) coordinator and worked child-related violations that included parental kidnapping, enticement, prostitution and child pornography. In January 2013, I transferred to the FBI's San Diego Division. I currently work on investigating crimes involving child exploitation and human trafficking. I am currently assigned to work on the San Diego Human Trafficking Task Force (SDHTTF).

2. Prior to my employment with the FBI, I was a local law enforcement officer for approximately seven years, with experience in general investigations, as well as an undercover narcotics investigator. I have served in the United States Armed Forces, Air National Guard, Security Forces. As part of my current duties, I investigate federal criminal violations relating to human trafficking and child exploitation including but not limited to 18 U.S.C. §§ 1591 and 1594 (sex trafficking of children or by fraud, force or coercion; conspiracy), 18 U.S.C. § 2251 (sexual exploitation of children), 18 U.S.C. § 2252(a)(4) (possession of matters containing images of minors engaged in sexually explicit conduct), 18 U.S.C. § 2421 and 2423 (transportation of persons and minors engaged in prostitution).

3. My training and experience, together with my consultation and experience working with colleagues, task force officers and subject matter experts, form the basis for the opinions I express below. This training and experience, as well as information obtained from other agents and witnesses, forms the basis for opinions I express below.

4. The following is based on my own investigation, oral and written reports by other law enforcement officers, physical and electronic surveillance, interviews, subpoenaed and public records,

business records, database checks, searches, phone analysis, and other investigations. Since this Affidavit is being submitted for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish the foundation for the requested Order.

## II

## PURPOSE OF THE AFFIDAVIT

5. This affidavit is in support of an application by the United States for a warrant to search the following items seized during the execution of a search warrant at the office for the websites GirlsDoPorn and GirlsDoToys, 121 W. Broadway, Suites 544, 545, 546, San Diego, CA, 92101, on October 9, 2019:

(1) One black Google cell phone with cityscape screen saver, **Target Device 1**;

(2) One black Google cell phone with mountains and lake screen saver, **Target Device 2**;

(3) One metallic blue Samsung cell phone, IMEI: 356273102020784, **Target Device 3**;

(4) One black Samsung Galaxy Note 8 cell phone, IMEI: 351824093079620, **Target Device 4**;

(5) One silver desktop tower, Service Tag: JQDXQD2, **Target Device 5**;

(6) One black Asus computer tower, S/N:GS1000SB0C410149, **Target Device 6**;

(7) One black CyberPower PC desktop computer, S/N: AB2128-527044-5, **Target Device 7**;

(8) One black generic desktop computer, **Target Device 8**;

(9) One black Ibuypower computer tower, **Target Device 9**; and

(10) Three silver external hard drives (one WD 500GB, S/N: WMC2E2888920; one WD 500GB, S/N: WMAYUA899319; and one 500GB Seagate, S/N: Z6ELGGJ1), **Target Device 10**;

(11) one black Apple iPhone (no additional external identifiers, but marked as 1b13), **Target Device 11**; and

(12) one black Apple iPhone, FCC ID: BCG-E3087A1C 579C-E3087A, **Target Device 12**.

*Affidavit in Support of Search Warrant*      2

Agents also seek to search one cell phone seized pursuant to a search warrant at A1 Storage, 2235 Pacific Highway, Unit 1116, San Diego, CA, 92101 on December 17, 2019, by law enforcement:

(13) One silver LG cell phone, **Target Device 13.**

6. The items discussed above are hereafter referred to collectively as the **Target Devices** and are more fully described in **Attachment A**. They are currently in the possession of the FBI and are stored in the FBI's evidence vault at 10385 Vista Sorrento Parkway in San Diego, California 92121.

7. Based on the facts set forth herein, I submit there is probable cause to believe that evidence, fruits, and instrumentalities of violations of U.S.C. § 1591(a) and (b)(1) (Sex Trafficking by Force, Fraud and Coercion), 18 U.S.C. § 1594(c) (Conspiracy to Commit Sex Trafficking by Force, Fraud and Coercion), and 18 U.S.C. § 1956 (Money Laundering), more specifically described in **Attachment B**, will be found in the **Target Devices**.

### III

### FACTS IN SUPPORT OF PROBABLE CAUSE

*Overview of the Conspiracy*

8. From at least 2010 through October 2019, Michael Pratt, Matthew Wolfe, Ruben Andre Garcia, Theodore Gyi, Valorie Moser and others participated in a conspiracy to recruit young adult women to engage in commercial sex acts by force, fraud and coercion. Over the internet, members of the conspiracy recruited young women from across the country and Canada, who were interested in modeling. Once the young women responded to on-line advertisements posted by the conspiracy, conspirators would sometimes advise the women that the jobs were in fact for pornographic videos, not modeling gigs, and participants, or "models," would receive approximately $3,000 to $5,000 for a video shoot. The women were often told that the video shoot would last no longer than 30 minutes. When presented with this revised offer, many of the women initially refused, often for fear that the videos would be published on the internet and damage their personal, educational and/or professional lives in various ways.

9. To convince women to appear in the adult videos, members of the conspiracy assured the women that the videos would not be posted on the internet and would only be distributed outside the United States on DVD or to supposed private collectors overseas. Members of the conspiracy assured the women that their friends and families would never learn that the women had appeared in the videos. To

*Affidavit in Support of Search Warrant*                                  3

help convince them, Pratt paid other young women working at his direction to act as references and provide false assurances to the women that, if they filmed a video, the video would not be posted online.

10. If a woman agreed to make a video, members of the conspiracy paid to fly her to San Diego within a day or two. When questioned in-person, Pratt, Garcia, Moser, Wolfe, and Gyi falsely assured the women their videos would not be posted on the internet. Garcia, whose job included having sex with the women on camera, frequently offered the young women marijuana or alcohol in the hotel room before presenting them with a document that he and the videographer (typically Gyi or Wolfe) refused to let the young women keep. After presenting the women with the document, the conspirators present in the room falsely paraphrased the contents of the document and then rushed the women to sign it.

11. Members of the conspiracy paid the women several thousand dollars for filming, often less than initially promised. Some of the women reported that Garcia or Wolfe sexually assaulted them before or after filming. Multiple women also reported that Garcia was very rough when performing sex acts; Pratt, Garcia, Wolfe, and others pressured them to engage in activities outside the scope of what they had agreed to; and, when they protested, Pratt, Garcia, Wolfe and others threatened them with economic repercussions, such as cancelling their flights home or making them pay for the hotel. Finally, women reported that the video shoot often lasted hours, much longer than the promised 30 minutes. After filming the videos, the women typically flew home the same day, or the next.

12. Typically, within a few months of filming, members of the conspiracy posted the videos online to fee-based websites such as girlsdoporn.com (GDP) and/or girlsdotoys.com (GDT), which were owned and operated by Pratt and Wolfe. These two websites offered a fee subscription service. Snippets of the videos were also posted on other third-party sites that were free, such as pornhub.com, to drive interest in and web traffic to GDP and GDT. According to financial records, GDP and GDT generated approximately $17 million in revenue.

13. Once the videos went on-line, the women experienced harassment that included anonymous social media accounts sending clips of their videos to the women's social media contacts, including their friends, parents, siblings, and college classmates. The women's names and addresses were also posted online around the time the video went up on a website connected to Pratt called pornwikileaks.com. Distraught, many women reached out to the contacts who recruited them. At Pratt's

direction, Moser forwarded any text message or complaint she would have received to Pratt. Moser testified during a civil trial that she informed Pratt of any complaints she received "every time." Others, such as Garcia and Pratt, just blocked the women's numbers and ignored their texts and emails.

14. In 2016, some of the victimized women filed a civil lawsuit in San Diego Superior Court against Pratt, Wolfe, Garcia, and others, alleging that they and others tricked the plaintiffs into appearing in pornographic videos posted to GDP and GDT. Trial in the civil case against Pratt and others started in August 2019. On January 2, 2020, the State Court judge in the civil case issued a decision ruling for the 22 victims, and finding Pratt, Wolfe and Garcia liable for $9,475,831.500 in compensatory damages and $3,300,000 in punitive damages.

*Request to Search the* **Target Devices**

15. On October 9, 2019, a warrant was issued to search 121 West Broadway, Suites 544, 545, 546, San Diego, CA 92101. *See* 19MJ4447. This was the business address for GDP and GDT. Pursuant to the warrant, agents seized a massive amount of data from the business, to include 24 boxes of paper documents, along with electronic media (cell phones, tapes, DVDs, disks, computers, hard drives and servers) totaling approximately 0.6 petabytes of electronic media. (One petabyte of data is equivalent to 20 million tall filing cabinets or 500 billion pages of standard printed text.) **Target Devices 1-12** were seized during the execution of this warrant.

16. During the same time period as they executed the search warrant, agents arrested Wolfe, Garcia, Gyi, Moser and Amberlyn Nored on a complaint. Although an arrest warrant was also issued for Pratt, he fled San Diego in the summer of 2019. His whereabouts remain unknown.

17. On November 7, 2019, an indictment was filed against Pratt, Wolfe, Garcia, Gyi, Moser, and Nored on charges of sex trafficking five adult women, and Pratt on charges of sex trafficking a minor and production of child pornography.

18. On December 17, 2019, agents executed a second warrant. *See* 19MJ5613. The warrant was executed on storage units 1116 and 1578, rented by Michael Pratt at A-1 Storage, 2235 Pacific Highway, San Diego, CA, 92101, at which time **Target Device 13** was seized.

19. Garcia, Moser and Gyi pled guilty. Garcia was sentenced to 20 years. Moser and Gyi are set for sentencing in July, 2022.

*Affidavit in Support of Search Warrant*                               5

20. On February 10, 2022, a superseding indictment was issued against the remaining two defendants charging Pratt and Wolfe with 19 counts of sex trafficking and money laundering against 15 adult victims and one minor victim.

21. When **Target Devices 1-3** were originally submitted to the San Diego Regional Computer Forensics Laboratory (RCFL), the analysts were unable to gain access into the devices. However, analysts believe that they now have the tools to gain access into these **Target Devices**.

22. As to **Target Devices 4 through 12**, agents seek to regain entry. Since agents last searched these devices, they have obtained a significant amount of additional information, learned of new victims, identified additional potential suspects, and enhanced their understanding of the means and manner of the conspiracy. Armed with this additional information, the agents seek to regain entry into these specific devices to identify additional evidence against the remaining Defendants and determine whether they should target additional suspects and co-conspirators.

23. Finally, on **Target Device 13**, agents failed to image **Target Device 13**, given the large amount of data that was being processed in this case. I am asking for the opportunity to have it imaged.

## IV
## PROCEDURES FOR ANALYSIS OF CELLULAR TELEPHONES

24. It is not possible to determine, merely by knowing the cellular telephone's or the electronic device's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Such devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and

software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

25. Following the issuance of the search warrant, I will collect the cellular telephones (**Target Devices 1, 2, 3, 4, 11, 12** and **13**), and subject these devices to analysis and search. All forensic analysis of the data contained within **Target Devices 1, 2, 3, 4, 11, 12** and **13** will employ search protocols directed exclusively to the identification and extraction of data within the scope of the warrant.

26. Based on the foregoing, identifying and extracting data subject to seizure pursuant to the search warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrants are signed, absent further application of this Court.

V

**PROCEDURES FOR ANALSYIS OF ELECTRONICALLY STORED INFORMATION ON COMPUTERS AND OTHER ELECTRONIC STORAGE MEDIA**

27. With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage media (**Target Devices 5-10**) that may contain data subject to seizure pursuant to this warrant:

Forensic Imaging

a. After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite. A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. The feasibility decision will be based upon the number of devices, the nature of the

devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team.  The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety.  The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance.  It can take several hours to image a single hard drive - the bigger the drive, the longer it takes.  As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

   b. If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices returned within forty-five (45) days of seizure, absent seizure as evidence or further application to this court.

Identification and Extraction of Relevant Data

   c. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users.  Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

   d. Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging.  Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process for several reasons.  The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last

accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

   e. It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

f. Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

g. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

h. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VI

## PRIOR ATTEMPTS TO OBTAIN THE DATA

28. The United States attempted to access **Target Devices 1** through **3**, but was unsuccessful. The United States has previously obtained data from **Target Devices 4** through **12**. Although a warrant issued to seize and search **Target Device 13**, the United States has not obtained or reviewed data from this device.

//

//

//

*Affidavit in Support of Search Warrant*      10

# VII
# GENUINE RISKS OF DESTRUCTION

29. Since the **Target Devices** are in the custody of law enforcement, there is no genuine risk of destruction.

# VIII
# REQUEST FOR SEALING OR DELAYED NOTICE

30. The United States is not requesting sealing or delayed notice. It will turn over the signed search warrant to counsel for Defendant Wolfe.

# IX
# CONCLUSION

31. Based on the facts above, my training and experience, and a review of the documents and other relevant information, I submit there is probable cause to believe that evidence, fruits and instrumentalities of violations of federal law, including but not limited to, U.S.C. § 1591(a) and (b)(1) (Sex Trafficking by Force, Fraud and Coercion), 18 U.S.C. § 1594(c) (Conspiracy to Commit Sex Trafficking by Force, Fraud and Coercion), and 18 U.S.C. § 1956 (Money Laundering), as forth in **Attachment B** will be found on or in the **Target Devices**, as more fully described in **Attachment A**.

Dated this 17th day of March, 2022.

LANA K. SABATA
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 17th day of March, 2022.

HONORABLE KAREN S. CRAWFORD
United States Magistrate Judge
Southern District of California

*Affidavit in Support of Search Warrant*          11

# ATTACHMENT A

The Target Devices to be searched are currently located at FBI's evidence vault at 10385 Vista Sorrento Parkway in San Diego, California 92121.

The Target Devices are specifically identified as follows:

(1) One black Google cell phone with cityscape screen saver, Target Device 1;

(2) One black Google cell phone with mountains and lake screen saver, Target Device 2;

(3) One metallic blue Samsung cell phone, IMEI: 356273102020784, Target Device 3;

(4) One black Samsung Galaxy Note 8 cell phone, IMEI: 351824093079620, Target Device 4;

(5) One silver desktop tower, Service Tag: JQDXQD2, Target Device 5;

(6) One black Asus computer tower, S/N:GS1000SB0C410149, Target Device 6;

(7) One black CyberPower PC desktop computer, S/N: AB2128-527044-5, Target Device 7;

(8) One black generic desktop computer, Target Device 8;

(9) One black Ibuypower computer tower, Target Device 9; and

(10) Three silver external hard drives (one WD 500GB, S/N: WMC2E2888920; one WD 500GB, S/N: WMAYUA899319; and one 500GB Seagate, S/N: Z6ELGGJ1), Target Device 10;

(11) one black Apple iPhone (no additional external identifiers, but marked as 1b13), Target Device 11; and

(12) one black Apple iPhone, FCC ID: BCG-E3087A1C 579C-E3087A, Target Device 12.

Located and seized from office for the websites GirlsDoPorn and GirlsDoToys, 121 W. Broadway, Suites 544, 545, 546, San Diego, CA, 92101, on October 9, 2019.

    (13)    One silver LG cell phone, Target Device 13.

Located and seized from A1 Storage, 2235 Pacific Highway, Unit 1116, San Diego, CA, 92101 on December 17, 2019.

ATTACHMENT B

Authorization is sought to search the subject devices listed in Attachment A for evidence that relates to violations of 18 U.S.C. § 1591 (a) and (b)(1) (Sex Trafficking by Force, Fraud and Coercion), 18 U.S.C. § 1594 (c) (Conspiracy to Commit Sex Trafficking by Force, Fraud and Coercion), and 18 U.S.C. § 1956 (Money Laundering). This authorization includes the search of electronic data to include deleted data, remnant data, slack space, and temporary and permanent files. The search of computers and computer media will be conducted in accordance with the "Procedures For Analysis Of Electronically Stored Information On Computers And Other Electronic Storage Media," and the search of cell phones will be conducted in accordance with the "Procedures For Analysis Of Cellular Telephones," both provided in the affidavit submitted in support of this warrant.

The evidence to be seized from the **Target Devices** will be electronic records, documents, communications, attachments, and data, for the period of January 1, 2010, up to and including October 9, 2019:

a. Communications, data, records, documents, attachments, audio or videos that assist in establishing an understanding of the charged conduct and elements of the conspiracy, its conspirators and/or co-conspirators as well as victims;

b. Communications, records, or attachments relating to the operation, ownership, and control of businesses and websites used in the conspiracy known and unknown such as: BLL Media, EG Publications, Oh Well Media, Domi Publications, girlsdoporn.com, girlsdotoys.com, pornwikileaks.com, beginmodeling.com, pornhub.com as well as third party sites associated with the above;

c. Communications, records, or attachments tending to discuss or establish any contact with any individual for or relating to recruitment or employment involving commercial sex acts, and any information tending to discuss or establish recruitment or employment for such acts by force, fraud, or coercion;

d. Communications, records, and attachments tending to discuss or establish name, date of birth and any other biographical information of women who appeared or attempted to appear in photos and videos;

e. Communications, records, and attachments tending to discuss or establish payment or promises of payment to solicit or recruit individuals to perform commercial sex acts;

f. Communications, records, and attachments tending to discuss or establish logistical arrangements to solicit, recruit, or record individuals performing commercial sex acts, including but not limited to hotel reservations, airplane flights, makeup artists, equipment costs, and travel to and from the hotel or airport;

g. Communications, records, and attachments tending to discuss or establish the financial transactions in support of and proceeds derived from soliciting, recruiting, or recording individuals performing commercial sex acts;

h. Communications, records, and attachments tending to discuss or establish any written agreements or contracts provided to or obtained from individuals recruited to perform commercial sex acts;

i. Communications, records, attachments, and data such as storage devices or services to include but not limited to third party applications, email addresses, IP addresses, VPN services, tending to identify or locate the user(s) of the accounts to be searched, and any co-conspirators involved in the activities described in III (a)-(h) above;

j. Communications, records, and attachments tending to identify the account user's state of mind, including knowledge, motive, and voluntariness, regarding the crimes under investigation; and

k. Communications, records, and attachments that provide context to any communications, records, videos, photographs and attachments described above, such as texting applications, electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify the user(s) of the account to be searched;

l. Communications, records and attachments tending to identify the user of, or persons with control over or access to, the **Target Device**; and

m. Communications, records and attachments tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data described above.

All which is evidence of violations of 18 U.S.C. § 1591 (a) and (b)(1) (Sex Trafficking by Force, Fraud and Coercion), 18 U.S.C. § 1594 (c) (Conspiracy to Commit Sex Trafficking by Force, Fraud and Coercion), and 18 U.S.C. § 1956 (Money Laundering).